# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

U.S. DEPARTMENT OF THE
TREASURY,

              Petitioner,

       v.

PENSION BENEFIT GUARANTY
CORPORATION,

          Interested Party,

       v.

DENNIS BLACK, et al.,

          Respondents.
_____

Case No. 12-mc-100 (EGS)

## MEMORANDUM OPINION

Pending before the Court is petitioner U.S. Department of the Treasury's ("Treasury") renewed motion to quash a subpoena *duces tecum* and motion to quash a deposition subpoena served upon it by Dennis Black, Charles Cunningham, Kenneth Hollis, and the Delphi Salaried Retirees Association (hereinafter "Respondents").  Upon consideration of the motions, responses and replies thereto, the relevant caselaw, and the entire record, and for the reasons set forth below, the motions are **DENIED**.

## I.   BACKGROUND

Respondents in this miscellaneous action are plaintiffs in *Black v. PBGC*, Case No. 09-13616, a civil action pending in the United States District Court for the Eastern District of Michigan (hereinafter "civil action" or "Michigan action"). Respondents are current and former salaried workers at Delphi Corporation ("Delphi"), an automotive supply company. In the civil action, Respondents allege that in July 2009, the Pension Benefit Guaranty Corporation ("PBGC") improperly terminated Delphi's pension plan for its salaried workers ("Plan") via an agreement with Delphi and General Motors ("GM"). Treasury is not a party to the civil action.

The civil action contains four counts. Count One alleges that the termination violated the Employee Retirement Income Security Act ("ERISA") because no court made findings that the Plan was unsustainable. Plaintiffs argue that such findings are a condition prerequisite to a valid termination under ERISA. *Black v. PBGC*, ECF #145 ¶ 39. Counts Two and Three allege additional procedural infirmities with the termination-by-agreement. *Id.* ¶¶ 44, 52. Finally, and most relevant to this miscellaneous action, Count Four alleges that the PBGC could not have satisfied ERISA's statutory requirements for termination had it actually sought court approval, pursuant to 29 U.S.C. §

1342(c).  *Id.* ¶ 56.  Essentially, plaintiffs' theory of the case

in the civil action, and specifically Count Four, is that PBGC

terminated the Plan "not because of anything related to its

statutory role under ERISA, but as a result of pressure imposed

by the Treasury and the related U.S. Auto Task Force to support

their efforts to restructure the auto industry in general and GM

in particular."  Resp'ts Opp'n to Renewed Mot. to Quash, ECF #19

at 3-4.

In September 2011, Judge Tarnow, who is presiding over the

civil action, ordered discovery to move forward.  He instructed

the parties to focus first on Count Four, specifically:

> [W]hether termination of the Salaried Plan would have been
> appropriate in July 2009 if, as Plaintiffs contend,
> Defendants were required under 29 U.S.C. § 1342(c) to file
> before this Court "for a decree adjudicating that the plan
> must be terminated in order to protect the interests of the
> participants or to avoid any unreasonable deterioration of
> the financial condition of the plan or any unreasonable
> increase in the liability of the fund."

*Black v. PBGC*, ECF #193 at 3-4.  Judge Tarnow explained that he

was proceeding in this fashion because:

> A finding by the Court in PBGC's favor on Count 4 after
> [discovery under the Federal Rules] would render moot the
> remainder of the complaint pertaining to the PBGC.  In the
> event that the Court finds that termination of the plan was
> not supported by the factors set forth in 28 U.S.C. §
> 1342(c), the Court will consider the remaining issues
> raised in the complaint.

*Id.* at 5-6.

The PBGC unsuccessfully moved for reconsideration of Judge Tarnow's order.  Shortly thereafter, plaintiffs served the PBGC with discovery requests which, they argue, are highly relevant to § 1342(c).  One of the requests directs PBGC to produce "all documents and things you received from . . . the Treasury Department, the Auto Task Force, the Labor Department, and the Executive Office of the President, or produced to the Federal Executive Branch, since January 1, 2009, related to Delphi . . . including but not limited to, documents related to the termination of the Delphi Pension Plans."  Pet'r's Mot to Quash, ECF #1, Ex. H at 8-9.  The PBGC refused to produce the documents, the plaintiffs moved to compel, and Magistrate Judge Majzoub ordered the PBGC to produce full and complete responses.  *Black v. PBGC*, ECF #209 at 1.  The PBGC filed objections to that order with Judge Tarnow.

Meanwhile, in January 2012, Respondents served Treasury with a subpoena seeking:

> All documents and things (including e-mails or other correspondence, spreadsheets, reports, analyses, snapshots, funding estimates, proposals or offers) received, produced, or reviewed by Matthew Feldman, [Harry Wilson, or Steven Rattner] between January 1, 2009 and December 31, 2009 related to: (1) Delphi; (2) the Delphi Pension Plans; or (3) the release and discharge by the [PBGC] of liens and claims relating to the Delphi Pension Plans.

Pet'r's Mot. to Quash, ECF #1, Ex. J at 5-6. Respondents allege that Feldman, Wilson and Rattner were the three principal Treasury employees who negotiated with the PBGC to terminate the Delphi Plan. Resp'ts Opp'n to Mot. to Quash, ECF #6 at 4, 10.[1] The Treasury filed this miscellaneous action to quash the subpoena in February 2012. Treasury made the same argument to this Court that the PBGC asserted in unsuccessfully opposing the motion to compel before Judge Majzoub and in its objections which were then pending before Judge Tarnow: the requested discovery is irrelevant because it relates to § 1342(c), and § 1342(c) is irrelevant to the Michigan action. *See, e.g.*, Pet'r's Reply in Support of Mot. to Quash, ECF #10 at 4-12.

Accordingly, in May 2012, this Court entered a minute order stating, in relevant part:

> [I]t appears to the Court that a threshold issue in this matter is whether the court in the underlying action has permitted discovery regarding the factors enunciated in 29 U.S.C. § 1342(c). In light of the fact that this precise issue is ripe for resolution before Judge Tarnow, the judge in the underlying action, the Court hereby STAYS this matter pending Judge Tarnow's resolution of PBGC's Objections to Magistrate Judge's Order of March 9, 2012 Granting Plaintiffs' Motion to Compel Discovery, Case 09-13616 (E.D. Mich.), Doc. No. 209. Plaintiffs are directed to notify this Court of Judge Tarnow's decision within five calendar days after it issues. This Order is subject to reconsideration for good cause shown.

Minute Order, May 17, 2012.

---

[1] All three left Treasury and returned to the private sector at some point during the summer of 2009. Pet'r's Renewed Mot. to Quash, ECF #15 at 10.

On August 13, 2013, Respondents moved to lift the stay. They noted that although Judge Tarnow had not yet ruled on the objections, in the interim, the PBGC "produced all documents sought by plaintiffs" which were responsive to Judge Majzoub's order. Resp'ts Mot. to Lift Stay, ECF #11 at 2. Accordingly, "it seems likely that the PBGC's objections to Judge Tarnow are now moot, or waived, or both." *Id*. at 3.[2] Respondents also proposed a modification to their subpoena *duces tecum*. *Id.* at 6. Respondents believe that Treasury has already produced certain documents and email correspondence relevant to the Delphi Pension issues to the Special Inspector General for the Troubled Asset Relief Program (SIGTARP). *Id.* at 7. They suggest it would be "a reasonable compromise" to modify the subpoena to request only those documents. *Id.* In proposing the modification, Respondents tried to address Treasury's argument that the subpoena imposes an undue burden; "producing documents already assembled and produced to SIGTARP involves no burden." *Id.* at 6.

A week later, on August 20, 2013, Respondents issued a deposition subpoena, which asks Treasury to produce one or more witnesses pursuant to Federal Rule of Civil Procedure 30(b)(6) to testify at deposition about:

---

[2] Indeed, on May 27, 2014 Judge Tarnow denied as moot the PBGC's Objections to Judge Majzoub's March 9, 2014 order. See Resp'ts Notice of Development in Underlying Case, ECF #25 Ex. A.

> [Matthew Feldman's and Harry Wilson's] communications in
> 2009 relating to the GM-Delphi relationship; the Delphi
> Pension Plans; and the release, waiver, or discharge by the
> PBGC of liens and claims relating to the Delphi Pension
> Plans.  These communications include, but are not limited
> to, communications with the PBGC, Delphi, GM, the Delphi
> DIP leaders, Federal Mogul, Platinum Equity, the National
> Economic Council, and the Executive Office of the
> President.

Deposition Subpoena, ECF #13-4.  Shortly thereafter, Treasury

filed a combined Renewed Motion to Quash the 2012 subpoena *duces*

*tecum* and Motion to Quash the 2013 deposition subpoena.  ECF

#15.  In its renewed motion, Treasury makes the same three

arguments as its initial motion – relevance, undue burden, and

cumulative/duplicative information.  *Id.* at 16-23.  It also adds

a new argument, claiming for the first time that the Respondents

lack standing to litigate the Michigan action, and thus may not

conduct any discovery, including discovery from Treasury.  *Id.*

at 13-16.  The renewed motion is ripe for review by the Court.

## II.  STANDARD OF REVIEW

### A. Standing

In a civil action, the plaintiff has the burden of

establishing that it has Article III standing.  *Sierra Club v.*

*Jackson*, 813 F. Supp. 2d 149, 154 (D.D.C. 2011) (citations

omitted).  To establish standing, plaintiff must show "at an

irreducible constitutional minimum": (1) that it has suffered an

injury in fact; (2) that the injury is fairly traceable to

defendant's conduct; and (3) that a favorable decision on the

merits likely will redress the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "While the burden of production to establish standing is more relaxed at the pleading stage than at summary judgment, a plaintiff must nonetheless allege 'general factual allegations of injury resulting from the defendant's conduct.'" *Nat'l Ass'n of Home Builders v. E.P.A.*, 667 F.3d 6, 12 (D.C. Cir. 2011). *See also NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (noting that "at the pleadings stage, 'the burden imposed' on plaintiffs to establish standing 'is not 'onerous'"").

**B. Motion to Quash**

A party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . [or which] appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Limiting discovery and quashing subpoenas pursuant to Rule 26 and/or Rule 45 "goes against courts' general preference for a broad scope of discovery." *North Carolina Right to Life, Inc. v. Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005). "Moreover, the general policy favoring broad discovery is particularly applicable where, as here, the court making the relevance determination has jurisdiction only over the discovery dispute, and hence has less familiarity with the intricacies of the governing substantive law than does the court overseeing the

underlying litigation." *Jewish War Veterans of the United States of Am., Inc. v. Gates*, 506 F. Supp. 2d 30, 42 (D.D.C. 2007) (citing *Flanagan v. Wyndham Int'l, Inc.*, 231 F.R.D. 98, 103 (D.D.C. 2005)).[3]

Discovery must be limited, however, if the "discovery sought is unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(2)(c). In addition, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id.* at 26(c); *see also* Fed. R. Civ. P. 45(d).

"The individual or entity seeking relief from subpoena compliance bears the burden of demonstrating that a subpoena should be modified or quashed." *Sterne Kessler Goldstein & Fox, PLLC v. Eastman Kodak Co.*, 276 F.R.D. 376, 379 (D.D.C. 2011) (citations omitted). "The quashing of a subpoena is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances. A court should be loath to quash a subpoena if other protection of less absolute character is possible. Consequently, the movant's burden is greater for a

---

[3] Treasury suggests that a more restrictive test of relevancy applies when the subpoena is directed to a non-party, Pet'r's Renewed Mot. at 17, "but it seems that there is no basis for this distinction in the rule's language." 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2459 (3d ed.); *see also Flanagan*, 231 F.R.D. at 103 (applying relevance standards to non-party subpoena that is at least as broad as party subpoenas).

motion to quash than if she were seeking more limited protection." *Flanagan*, 231 F.R.D. at 102 (internal citations and quotation marks omitted).

## III. DISCUSSION

### A. Standing

For the first time in its renewed motion to quash, Treasury, a non-party to the underlying case, argues that respondents have no standing to litigate the Michigan action. Pet'r's Renewed Mot. to Quash at 13-16. Treasury concedes that the parties to the Michigan action have not raised standing issues in the Michigan court. *Id.* at 13-14. Nevertheless, it contends that "this Court is a proper forum in which to challenge the standing of respondents to litigate" the Michigan case, because "third party discovery may be permitted only to the extent it relates to viable claims." *Id.* at 14, n.11. It then makes cursory arguments, in just four pages of its brief, which purport to address standing issues in the highly complex ERISA litigation which has been pending in Michigan for five years.

This Court is deeply skeptical of Treasury's argument that the Court should address Article III standing in a case where the merits are not before it, and indeed, where it "*has jurisdiction only over the discovery dispute*, and hence has less familiarity with the intricacies of the governing substantive

law than does the court overseeing the underlying litigation."
*Jewish War Veterans*, 506 F. Supp. 2d at 42 (citations omitted)
(emphasis added).  It is true, of course, that an "ancillary
discovery proceeding is, by its very terms, an extension of the
underlying proceeding and the subject matter jurisdiction of the
ancillary proceeding is derived from the jurisdiction of the
underlying case."  *McCook Metals LLC v. Alcoa*, *Inc.*, 249 F.3d
330, 334 (4th Cir. 2001).  However, this does not mean that in
resolving the discrete, non-party discovery issue before it, the
Court may reach into the merits of the underlying case, ongoing
in another court halfway across the country, and determine that
court's jurisdiction over those claims.  Indeed, Treasury has not
provided a single authority where a court exercising ancillary
jurisdiction over only a single discovery motion has addressed
the subject matter jurisdiction of a sister court presiding over
the underlying litigation.  Asking this Court to review another
court's jurisdiction seems particularly inappropriate because
the issue can never be waived: a standing challenge may be
raised at any time during the Michigan litigation, either by the
parties or *sua sponte* by that court.[4]

_____

[4] If the subpoenas had been issued after December 1, 2013, the
Court would have seriously considered transferring the motion to
quash to the Michigan court in light of the December 1, 2013
amendments to Rule 45.  The Rule, as amended, now requires that
subpoenas be issued "from the court where the action is
pending," Fed. R. Civ. P. 45(a)(2), and further provides that

Assuming *arguendo* it is appropriate for this court to undertake a standing analysis, and based on the limited record before it, the Court rejects Treasury's arguments. In order to demonstrate standing, a plaintiff must adequately establish an injury-in-fact, causation and redressability. *Lujan*, 504 U.S. at 560-61. At the pleading stage, where the underlying litigation remains, "'the burden imposed' on plaintiffs to establish standing 'is not onerous'." *NB ex. rel. Peacock*, 682 F.3d at 82. Treasury does not dispute that Respondents have been injured through the termination of their pension plan, but denies causation and redressability. Pet'r's Renewed Mot. at 14-16.

On the causation issue, Treasury argues that Respondents cannot show that their injury was fairly traceable to the PBGC.

> [T]he fact that respondents are not receiving the full amount of their pension benefits is attributable to the fact that "Delphi did not have enough money to fund its pensions" . . . . not to the fact PBGC terminated the . . . Plan by agreement with Delphi "to avoid any unreasonable increase in the liability of the PBGC insurance fund."

*Id.* at 14 (citations omitted). This argument is nothing more than an assertion that the PBGC should win on the merits of the case. In their Second Amended Complaint, plaintiffs have alleged that their Plan was terminated by PBGC for political

---

"[w]hen the Court where compliance is required did not issue the subpoena, it may transfer a motion [to quash] to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances." *Id.* 45(f).

reasons and in violation of ERISA, *not* because the Plan was no longer financially viable or because PBGC had statutory authority to terminate. *See, e.g.*, *Black v. PBGC*, Second Amended Complaint, ECF #145 ¶ 56. This is precisely the issue in discovery in the Michigan court. This Court takes no position whether Respondents will prevail on their claims. At the pleading stage, however, it appears that Respondents have alleged a causal link.

Treasury also argues that plaintiffs' injuries are not redressable by the Michigan Court. It claims that Respondents are not entitled to equitable relief from the PBGC because equitable "payments of money from the Federal Treasury are limited to those authorized by statute," *OPM v. Richmond*, 496 U.S. 414, 416 (1990), and "[r]espondents do not point to any statute that would authorize PBGC to pay them more in pension benefits than they now are receiving." Pet'r's Renewed Mot. at 16. This argument fares no better than Treasury's causation claims. Congress has authorized any plan participant "adversely affected by any action of the [PBGC] . . . [to] bring an action against the [PBGC] for appropriate equitable relief in the appropriate court." 29 U.S.C. § 1303(f)(1). Plaintiffs request a variety of forms of equitable relief in their Second Amended Complaint, not limited to an order forcing the PBGC paying higher pensions to the salaried workers and retirees. *See Black*

*v. PBGC*, Sec. Am. Compl. Prayer for Relief, ECF #145 at 22-23.
Again, this Court takes no position on what relief, if any,
Respondents will obtain from the PBGC or the other defendants in
the case.  However, at the pleading stage of the litigation,
this Court agrees with Judge Tarnow, who "declin[ed] to accept
[the PBGC's] position that Plaintiffs cannot obtain any relief
in this lawsuit if the [Michigan] [c]ourt concludes that the
PBGC acted improperly." *Black v. PBGC*, Order 2/17/10, ECF #122
at 3.

### B. Relevance

Treasury argues that the information Plaintiffs seek is
irrelevant because 29 U.S.C. § 1342(c) authorizes the PBGC to
initiate a termination of a pension plan "in order to avoid 'any
unreasonable increase in the liability of the [PBGC insurance]
fund.'"  Pet'r's Renewed Mot. at 18.  Accordingly, Treasury
claims, it is irrelevant whether Treasury encouraged PBGC to do
anything; the PBGC acted in accordance with ERISA in seeking
termination.  *Id.* at 18-19.  Respondents counter that § 1342(a)
permits the PBGC to *seek* termination on this basis, but does not
permit it to actually terminate a Plan without a court's
determination that a Plan "must" be terminated under the §
1342(c) criteria: "[I]n order to protect the interests of the
participants or to avoid any unreasonable deterioration of the
financial condition of the plan or any unreasonable increase in

14

the liability of the fund." *See* Resp'ts Opp'n to Renewed Mot.

at 21-22. Respondents argue that a reviewing court would not

have made findings that these statutory criteria were met and

that the Plan "must" terminate; rather, the PBGC violated the

statute and improperly terminated the Plan because it was under

political pressure from Treasury. *Id.* They argue that discovery

from Treasury is therefore relevant. Respondents prevail.

In Judge Tarnow's September 1, 2011 discovery order, the

U.S. District Court for the Eastern District of Michigan made a

determination that this information was relevant. Judge Tarnow

allowed discovery to move forward on Count 4 of the Complaint,

specifically:

> [W]hether termination of the Salaried Plan would have been
> appropriate in July 2009 if, as Plaintiffs contend,
> Defendants were required under 29 U.S.C. § 1342(c) to file
> before this court "for a decree adjudicating that the plan
> must be terminated in order to protect the interests of the
> participants or to avoid any unreasonable deterioration of
> the financial condition of the plan or any unreasonable
> increase in the liability of the fund." . . . . In the
> event that the Court finds that termination of the plan was
> not supported by the factors set forth in 28 U.S.C. §
> 1342(c), the Court will consider the remaining issues
> raised in the complaint.

*Black v. PBGC*, ECF #193 at 3-6. Following Judge Tarnow's order,

Plaintiffs requested information from the PBGC very similar to

that it now requests from Treasury: information designed to

reveal whether the PBGC could have satisfied the § 1342(c)

factors or whether, instead, it improperly yielded to pressure

from other federal entities, including Treasury. Pet'r's Mot to Quash, ECF #1, Ex. H at 8-9. Judge Majzoub granted Plaintiffs' motion to compel that information. *Black v. PBGC*, ECF #209. Accordingly, two judges in the underlying action evaluated the question of relevance for very similar materials, sought for very similar reasons, and found them relevant. Although the "law of the case" doctrine is not dispositive of Respondents' motion, it does support this Court's decision to rely on the relevance analysis performed by the Eastern District of Michigan. *See Flanagan*, 231 F.R.D. at 103, n.2 ("While the doctrine of the law of the case is no more than a guiding principle and does not diminish this Court's discretion to revisit prior decisions of a coordinate court, it 'expresses the practice of courts generally to refuse to reopen what has been decided.'") (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988)). In the context of Rules 26 and 45, the above considerations establish a sufficient showing of relevance needed to permit the Respondents to obtain documents and other items and to depose a Treasury official in this case.

### C. Burden

A trial court may quash or modify a subpoena on the ground that the request is unreasonable or oppressive. Fed. R. Civ. P. 26(c). "What constitutes unreasonableness or oppression is, of

course, a matter to be decided in the light of all the circumstances of the case. . . ." *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C. Cir. 1984) (citation and internal quotation marks omitted). "[T]he burden of proving that a subpoena . . . is oppressive is on the party moving for relief on this ground. . . . The burden is particularly heavy to support a motion to quash as contrasted to some more limited protection," such as a request for modification. *Id.* at 404 (quoting *Westinghouse Elec. Corp. v. City of Burlington, Vt.*, 351 F.2d 762, 766 (D.C. Cir. 1965)). The moving party may not "simply allege a broad need for a protective order so as to avoid general harm, but must demonstrate specific facts which would justify such an order." *Flanagan*, 231 F.R.D. at 102 (citations omitted). There are two subpoenas at issue in this case. The Court examines them in turn.

   *1) Subpoena Duces Tecum*

   Respondents' subpoena duces tecum is narrow. It seeks documents created, received or reviewed by three Treasury officials, over a single calendar year, relating only to Delphi. Moreover, Respondents have expressed their willingness to modify the subpoena to encompass only those documents Treasury already produced to SIGTARP and to the House Oversight and Government Reform Committee. *See, e.g.*, Resp'ts Opp'n to Renewed Mot. at 29-30. Nevertheless, Treasury argues that the subpoena, even

with proposed modifications, is oppressive and must be quashed. Treasury provides a declaration from Rachana Desai, Acting Chief Counsel of the Treasury's Office of Financial Stability, which states that in responding to the subpoena *duces tecum*, Treasury "could be" required to search the three officials' email inboxes, review over 15,000 electronic documents and 28 boxes of files, and then review documents for responsiveness and privilege. Desai Decl. ¶ 7, ECF #15-7. Even the modifications offered are unacceptable, Desai asserts, because Treasury "would need to review each responsive document" provided to SIGTARP and the U.S. House Committee for "responsiveness" and "possible assertion of claims of privilege." *Id.* ¶¶ 9-11.

Treasury has not carried its heavy burden to show that the subpoena *duces tecum* is oppressive. Although Treasury claims it will have to search a significant number of documents to respond to the subpoena, "volume alone is not determinative." *Northrup Corp.*, 751 F.2d at 404 (citation omitted). Moreover, the number of documents could drop significantly if Treasury agreed to Respondents' proposed modifications.[5]

---

[5] Treasury responded negatively to Respondents' offer to modify the subpoena *duces tecum*, arguing that the modifications would result in an equally heavy burden on the Treasury. *See, e.g.*, Pet'r's Renewed Mot. at 21-22. Accordingly, the Court does not modify the subpoena. The parties are of course free to negotiate modifications to the subpoena without further litigation.

Treasury's remaining claim of burdensomeness is that it will have to make privilege determinations for the documents. This naked assertion is insufficient to quash the subpoena for two reasons. First, Treasury offers no support for its claim that a substantial number of the documents will be privileged. There is no basis for the Court to impose the "extraordinary measure" of quashing a subpoena, *Flanagan*, 231 F.R.D. at 102, based on a "purely speculative" privilege claim. *Northrup*, 751 F.2d at 405. Second, most subpoenas *duces tecum* require the recipient to conduct a privilege review. If the "good cause" requirement for quashing a subpoena could be met by a bare assertion that privilege review constitutes an undue burden, discovery under the Federal Rules would quickly grind to a halt.

*2) Deposition Subpoena*

Treasury argues that "[n]o one currently working at Treasury has knowledge of the communications referenced in respondents' deposition subpoena to Treasury except insofar as he or she has reviewed the record or read emails to or from Mr. Feldman or Mr. Wilson since the time that [they] left the Auto Team . . . . [A]ny witness designated to testify . . . would need a substantial amount of time to prepare." Desai Decl. ¶ 12, ECF #15-7; see also Pet'r's Reply in Support of Renewed Mot. at 19, ECF #21 (explaining that the Auto Team had twelve Treasury employees, none of whom still works for Treasury).

Respondents counter that Treasury likely has the ability to compel Feldman and Wilson to testify; "[n]evertheless, if it is the Treasury's position that it cannot produce [Mr. Feldman and Mr. Wilson], and further that it is otherwise incompetent to testify about the communications these individuals undertook with respect to the Delphi issues, then Respondents will withdraw the Deposition Subpoena and reissue Rule 45 subpoenas to Messrs. Feldman and Wilson directly." Resp'ts Opp'n to Renewed Mot. to Quash at 31, ECF #19. Treasury responds by insinuating that it would move to quash such subpoenas "if and when they are issued because such subpoenas will seek information belonging to Treasury." Pet'r's Reply in Support of Renewed Mot. at 20.[6]

It appears that Treasury's principal undue burden argument is that no one with institutional knowledge about Mr. Feldman's and Mr. Wilson's role in the termination of the Delphi Plans remains at Treasury; accordingly, someone would have to learn the material as new in order to testify. Respondents effectively concede that this would be burdensome by offering to withdraw their deposition subpoenas if and only if Treasury

---

[6] Obviously, it would be premature to speculate as to the contents of a future, hypothetical motion to quash. Treasury is cautioned, however, to carefully consider this Opinion before filing any such motion.

cannot compel Mr. Feldman and Mr. Wilson to testify in response
to the outstanding subpoena.

The Court agrees with Respondents. Treasury has made no
showing that the deposition subpoena would be burdensome except
in the event that no one at Treasury (or from whom it has
authority to compel testimony) is competent to respond to it.
Accordingly, the parties are directed to confer and determine,
within 30 days of the date of this Order, whether Treasury can
compel Mr. Feldman and Mr. Wilson to testify in response to the
subpoena. In the event that it cannot, Respondents shall
withdraw the deposition subpoena.

### D. Duplicative/Cumulative Information

Finally, Treasury argues the subpoenas should be quashed
because they are cumulative. Treasury contends that "[t]he
immensity of PBGC's document production and the overlap between"
the document requests to PBGC "and respondents' subpoenas to
Treasury leave little need for Treasury to respond to [the]
subpoena[]." Pet'r's Renewed Mot. at 24. Treasury also argues
that Mr. Feldman and Mr. Wilson have testified at depositions in
other actions, and at "numerous congressional hearings at which
the Delphi Salaried Plan and its termination have been
discussed." *Id.* Respondents counter that "at the time the Plan
was terminated, the Treasury was directly negotiating the future
of Delphi with a number of players besides the PBGC, including

GM, Delphi, Delphi's DIP Lenders, Federal Mogul, Platinum
Equity, and various unions. Moreover the Auto Team was
deliberating amongst itself and various White House officials as
to what to do in relation to the Delphi plans. . . . In short,
while it is true that the PBGC has produced some (and hopefully
most) of the email correspondence between it and the Treasury,
such information is only a part of the relevant responsive
documents in the Treasury's possession." Resp'ts Opp'n to
Renewed Mot. at 34-35. Respondents also argue that Feldman and
Wilson's testimony would not be cumulative because neither of
them has been deposed in *Black v. PBGC*. *Id.* at 36.

For the reasons discussed throughout, the motion to quash
must be denied. The subpoenas request information that has been
adjudicated as relevant to, and discoverable in, the Michigan
litigation. Although the documents requested may have some
overlap with documents already produced by PBGC, Treasury has
failed to show, as it must, that it would be "unreasonably
cumulative or duplicative." Fed. R. Civ. P. 26(b)(2)(c)(i).
Likewise, Feldman and Wilson have access to information about
Treasury's role in the Plan's termination which Respondents are
unable to obtain elsewhere. Again, although their depositions
will likely overlap somewhat with Feldman and Wilson's testimony
in other proceedings, some overlap does not justify foreclosing
discovery in this case. As this Circuit has noted,

"[d]epositions . . . rank high in the hierarchy of pre-trial, truth-finding mechanisms." *Founding Church of Scientology v. Webster*, 802 F.2d 1448, 1451 (D.C. Cir. 1986). Without the opportunity to depose Mr. Feldman and Mr. Wilson in this case, Respondents' counsel is denied "the opportunity . . . to probe the veracity and contours of the[ir] statements . . . [and] is denied the opportunity to ask probative follow-up questions." *Alexander v. FBI*, 186 F.R.D. 113, 121 (D.D.C. 1998).

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that non-party Department of the Treasury has failed to meet its burden under Federal Rules of Civil Procedure 26 and 45 to quash the subpoena *duces tecum*. Accordingly, the Renewed Motion to Quash is **DENIED** insofar as it relates to the subpoena *duces tecum*.[7]

The Court further concludes that the Department of the Treasury has failed to meet its burden under Federal Rules of Civil Procedure 26 and 45 to quash the deposition subpoena unless Treasury is unable to compel its former employees, Mr. Feldman and Mr. Wilson, to testify in response to the subpoena. The record before the Court is unclear on this point.

---

[7] Respondents ask that Treasury be given 30 days to comply fully with the subpoena, while Treasury states that it will take "far longer" to comply. Pet'r's Reply in Support of Renewed Mot. at 23. The parties are directed to work together in good faith to promptly comply with the Court's order, and avoid wasting the parties' and the Court's time and resources with unnecessary additional disputes.

Accordingly, it is hereby **ORDERED** that the parties confer and determine, within 30 days of the date of this Order, whether Treasury can compel Mr. Feldman and Mr. Wilson to testify in response to the subpoena. In the event that Treasury can compel their testimony, the Renewed Motion to Quash the Deposition Subpoena is **DENIED**. In the event that it cannot compel these two individuals to testify, it is **FURTHER ORDERED** that Respondents shall withdraw the deposition subpoena.

A separate order accompanies this Memorandum Opinion.

**SIGNED:**    **Emmet G. Sullivan**
              **United States District Judge**
              **June 19, 2014.**