**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                )
U.S. DEPARTMENT OF THE          )
TREASURY                        )
                                )
          Petitioner,           )
                                )
          v.                    )   Case No. 12-mc-100 (EGS)
                                )
PENSION BENEFIT GUARANTY        )
CORPORATION                     )
                                )
          Interested Party,     )
                                )
          v.                    )
                                )
DENNIS BLACK, et al.,           )
                                )
          Respondents           )
_____ )
```

<u>**MEMORANDUM OPINION**</u>

This miscellaneous action began six years ago when
Petitioner, the United States Department of Treasury
("Treasury"), moved to quash Dennis Black, Charles Cunningham,
Ken Hollis and the Delphi Salaried Retirees Association's
(collectively, "Respondents") subpoena requesting documents
related to Treasury's involvement in the termination of
Respondents' pension plan. That subpoena arose from a civil
action that began nine years ago and is currently pending in the
United States District Court for the Eastern District of
Michigan. In the civil action, Respondents allege that the
Pension Benefit Guaranty Corporation illegally terminated

Delphi's pension plan for its salaried workers, via an agreement with Delphi and General Motors, because of improper pressure exerted by Treasury.

In the last four years, the Court has evaluated Treasury's various claims of privilege and has conducted *in camera* review of hundreds of documents related to multiple rounds of briefing. Pending before the Court is the Respondents' renewed motion to compel the production of 61 documents withheld by Treasury under a claim of the presidential communications privilege. Upon consideration of the renewed motion, response and reply thereto, the relevant case law, and the entire record, and for the reasons set forth below, the motion is **GRANTED in PART and DENIED in PART.**

## I. BACKGROUND

### A. Statutory Background

In 1974 Congress passed the Employee Retirement Income Security Act (ERISA) with the goal of safeguarding employees against the loss of expected retirement benefits. 29 U.S.C. § 1301 et. seq. In passing this law, "Congress wanted to guarantee that 'if a worker has been promised a defined pension benefit upon retirement--and if he has fulfilled whatever conditions are required to obtain a vested benefit--he actually will receive it.'" *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) (citations omitted). To that end, Title IV of ERISA created the

Pension Benefit Guaranty Corporation ("PBGC") "a mandatory Government insurance program that protects the pension benefits of over 30 million private-sector American workers who participate in plans covered by the Title." *PBGC v. LTV Corp.*, 496 U.S. 633, 637 (1990). The PBGC is a "wholly owned Government corporation within the Department of Labor." *R.A. Gray & Co.*, 467 U.S. at 720. The Board of Directors of the corporation "consists of the Secretary of the Treasury, the Secretary of Labor, and the Secretary of Commerce." 29 U.S.C. § 1302(d)(1).

Title IV of ERISA expressly defines the purposes of the PBGC. These purposes are threefold and are aimed at protecting pension participants. The first enumerated purpose is to "encourage the continuation and maintenance of voluntary private pension plans for the benefit of their participants." 29 U.S.C. § 1302(a)(1). The second purpose is to "provide for the timely and uninterrupted payment of pension benefits to participants and beneficiaries." *Id.* § 1302(a)(2). The last enumerated purpose is "to maintain premiums . . . at the lowest level consistent with carrying out its obligations." *Id.* § 1302(a)(3). As these purposes illustrate, the PBGC is entrusted by Congress, and by the public through its representatives, with the task of "ensur[ing] that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated

in the plans." *R.A. Gray & Co.*, 467 U.S. at 720 (citations omitted).

Termination cannot be avoided at all costs, however. The Act recognizes that under certain circumstances a plan must be terminated in order to "protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." 29 U.S.C. § 1342(c)(1); *see also LTV Corp.*, 496 U.S. at 641 (recognizing some plans must be terminated to "protect the insurance program from the unreasonable risk of large losses."). As the Act explains, "[the PBGC] may institute proceedings . . . to terminate a plan whenever it determines" that *inter alia*, the "plan has not met the minimum funding standard required," "the plan will be unable to pay benefits when due," or "the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated." 29 U.S.C. § 1342(a)(1)-(4). If the PBGC has determined that the plan should be terminated, "it may, upon notice to the plan administrator," apply to the appropriate U.S. district court for a "decree adjudicating that the plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the

plan or any unreasonable increase in the liability of the fund."
*Id.* § 1342(c)(1).

## B. Factual Background

Respondents in this miscellaneous action are retired salaried employees of the Delphi Corporation ("Delphi"), an automotive supply company, and an association of retired salaried employees of Delphi. Respondents are also plaintiffs in *Black v. PBGC*, Case No. 09-13616, a civil action pending in the United States District Court for the Eastern District of Michigan ("civil action") since 2009. In that civil action, Respondents alleged that the PBGC violated Title IV of ERISA and the United States Constitution when it was forced to wrongfully terminate Respondents' pension. Respondents' theory of the case is that the "termination occurred as the result of politics, with Treasury having impermissibly pressured the PBGC to acquiesce in the Plan's termination as part of Treasury's political goals in restructuring the auto industry in general, and GM in particular." Renewed Mot. Compel, ECF No. 70 at 10.[1] Treasury is not a part of the civil action.

This miscellaneous action began when Treasury moved to quash a subpoena *duces tecum* served by the Respondents seeking

---

[1] When citing electronic filings throughout this opinion, the Court cites to the ECF header page number, not the page number of the filed document.

information related to its claims in the civil action. Treas. Mot. Quash, ECF No. 1. Specifically, the subpoena sought all documents and things received by, produced or reviewed by certain Treasury employees between January 1, 2009 and December 31, 2009 related to "(1) Delphi; (2) the Delphi Pension Plans; or (3) the release and discharge by the [PBGC] of liens and claims relating to the Delphi Pension Plans." *Id.* at 252–53.

In a Memorandum Opinion dated June 19, 2014, ECF No. 27, this Court ruled that Treasury had failed to meet its burden under Federal Rules of Civil Procedure 26 and 45 to quash the subpoena *duces tecum* and therefore denied the motion to quash. Treasury responded to the subpoena by withholding or redacting 1,273 documents under four separate claims of privilege: (1) the deliberative process privilege; (2) the presidential communications privilege; (3) the attorney-client privilege; and (4) the work-product privilege. *See generally* Mot. Compel, ECF. No. 30. Although Treasury asserted privilege for over 1,000 documents, Respondents only challenged the claims of privilege for 866 documents. Treas. Opp'n, ECF No. 35 at 9.

The Court ordered *in camera* review of all the documents at issue to better evaluate Treasury's claims of privilege. *See* Minute Entry of July 15, 2016. Ten days later, Treasury produced, *in camera*, hard copies of the contested documents noting that "[i]n preparing its production, Treasury decided not

to continue withholding certain documents." *See* Notice of
Production, ECF No. 40 at 1. Treasury revoked its claims of
privilege over nearly 640 of the 866 contested documents without
providing any explanation as to why it suddenly withdrew its
claim of privilege over nearly 75% of the documents it
previously claimed were protected from disclosure. *See id.*

After reviewing the remaining documents *in camera*, in a
Memorandum Opinion dated December 20, 2016, the Court concluded
that Treasury failed to provide a specific articulation of the
rationale supporting the deliberative process privilege and
ordered Treasury to produce to Respondents all of the documents
over which it asserted solely the deliberative process
privilege. Mem. Op., ECF No. 42 at 6–13. The Court further
ordered Treasury to submit an updated *in camera* production and
privilege log containing the documents withheld under the other
three privileges. *Id.* at 13.

Treasury submitted 85 documents in response to the Court's
Order. *See* Mem. Op., ECF No. 45 at 3. Relevant to this renewed
motion to compel, Treasury asserted the presidential
communications privilege as the basis for withholding 63
documents from production. *Id.* at 4. In a Memorandum Opinion
dated April 13, 2017, the Court concluded that the documents
were covered by the presidential communications privilege, but
that Respondents had demonstrated a sufficient need for the

documents to overcome the privilege. *Id.* at 3-11. Accordingly, the Court ordered production of the 63 documents over which Treasury had asserted the presidential communications privilege produced to Respondents. *See* Order, ECF No. 44 at 1.

Treasury appealed the Court's Order, and the Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") remanded the case back to this Court. *U.S. Dep't of Treasury v. Black*, No. 17-5142, 2017 WL 6553628, (D.C. Cir. Dec. 8, 2017). Specifically, the D.C. Circuit remanded the case for this Court to "account for how the public interests in this case" differ from prior decisions in which courts have analyzed the presidential communications privilege, *id.* at *1, and to "thoroughly analyze whether [Respondents] demonstrated a need sufficient to overcome the privilege," *id.* at *3.

Respondents have since filed a renewed motion to compel challenging 61 of the 63 documents over which Treasury claims the presidential communications privilege.[2]  The documents can be grouped into three categories: (1) Draft memoranda from staffers to Dr. Lawrence Summers, the Director of the National Economic Council, Assistant to the President for Economic Policy, and co-chair of the Presidential Task Force on the Auto Industry ("Auto

---

[2] Respondents no longer seek to compel two documents relating to drafts of a March 28, 2009 Presidential speech. *See* Renewed Mot. Compel, ECF No. 70 at 10 n.2. Accordingly, Respondents' motion concerns only 61 documents.

Task Force"), providing updates regarding GM and Delphi; (2)

electronic mail conversations among federal employees that

supported Dr. Summers and the Auto Task Force ("Auto Team

members") concerning advice provided to President Obama

regarding GM, Delphi, and the PBGC; and (3) personal requests

for information by President Obama about the Delphi Salaried

Plan, along with Treasury emails and a memorandum in response.

Renewed Mot. Compel, ECF No. 70 at 28. Treasury filed its

opposition to Respondents' motion to compel, ECF. No. 74, and

Respondents subsequently filed their reply in support, ECF No.

75. The motion is now ripe for decision.

## II. LEGAL STANDARD

The presidential communications privilege is a "presumptive

privilege" necessary to "guarantee the candor of presidential

advisers and to provide 'a President and those who assist him .

. . with freedom to explore alternatives in the process of

shaping policies and making decisions and to do so in a way many

would be unwilling to express except privately.'" *In re Sealed

Case*, 121 F.3d 729, 743 (D.C. Cir. 1997) (alterations omitted)

(quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). The

privilege "is rooted in the need for confidentiality to ensure

that presidential decisionmaking is of the highest caliber,

informed by honest advice and full knowledge." *Id.* at 750. This

confidentiality is important because it is "what ensures the

expression of 'candid, objective, and even blunt or harsh opinions' and the comprehensive exploration of all policy alternatives before a presidential course of action is selected." *Id.* (citation omitted).

Although entitled to great weight because of the need for confidentiality, the presidential communications privilege should be construed as "narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected." *Id.* at 752. Moreover, assuming arguendo a former president may assert the privilege, "such a claim carries much less weight than a claim asserted by the incumbent himself." *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977). Ultimately, the application of the privilege "depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case." *In re Sealed Case*, 121 F.3d at 743 (citation omitted). In the context of civil discovery, a court must assess "the public interests at stake in determining whether the privilege should yield in a particular case, and must specifically consider the need of the party seeking privileged evidence." *See id.* at 746.

The D.C. Circuit has had several occasions to discuss the presidential communications privilege in various circumstances. In *Nixon v. Sirica*, the D.C. Circuit discussed the application

of the privilege in the criminal context. 487 F.2d 700 (D.C.
Cir. 1973). *Sirica* concerned a subpoena issued by a grand jury
investigating the break-in at the Watergate Hotel for certain
tape recordings of telephone conversations that had taken place
between President Nixon and his advisors. *Id.* at 704–705. Nixon
refused to produce the tape recordings asserting the
presidential communications privilege. *Id.* at 705. The D.C.
Circuit explained that the claim of privilege "depend[ed] on a
weighing of the public interest protected by the privilege
against the public interests that would be served by disclosure
in a particular case." *Id.* at 716. In weighing those interests,
the Court recognized that there was a great public interest in
preserving "the confidentiality of conversations that take place
in the President's performance of his official duties" in order
to protect "the effectiveness of the executive decision-making
process." *Id.* at 717. The Court held, however, that the
privilege was overcome because of the "showing made by the
Special Prosecutor" in that case. *Id.* Specifically, the Special
Prosecutor had made a "strong showing that the subpoenaed tapes
contain[ed] evidence" necessary to the carrying out of a vital
function of the grand jury which was to "indict persons when
there is probable cause to believe they have committed crime,
but also to protect persons from prosecution when probable cause
does not exist." *Id.* at 717. Accordingly, the Court held the

district court could order disclosure of portions of the tapes relevant to the scope of the grand jury investigation. *Id.* at 721.

The Supreme Court addressed the presidential communications privilege in the context of a criminal case a year later in *United States v. Nixon*, 418 U.S. 683 (1974). *Nixon* also concerned a subpoena by a grand jury for several tape recordings and documents relating to President Nixon's conversations with his advisors. *Id.* at 688. The Court noted that President Nixon did not place his "claim of privilege on the ground that [the communications were] military or diplomatic secrets." *Id.* at 710. After determining that the public interest at stake was the "President's generalized interest in confidentiality" the Court weighed this "generalized interest" against "the inroads of such a privilege on the fair administration of criminal justice." *Id.* at 711–12. In weighing these interests, the Court concluded that although the "interest in preserving confidentiality . . . is entitled to great respect . . . the allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts." *Id.* at 712. Accordingly, the Court remanded the case for the district court to determine, via *in camera* review, what relevant and

admissible evidence in the tapes would be released to the
Special Prosecutor. *Id.* at 713-14.

Of most relevance to this case, the D.C. Circuit first
considered the presidential communications privilege in the
civil context in *Dellums v. Powell*, 561 F.2d 242 (D.C. Cir.
1977). *Dellums* concerned a subpoena for tapes and transcripts of
White House conversations in connection with claims that
plaintiffs were unconstitutionally detained for protesting
American military involvement in Southeast Asia. 561 F.2d at
244. Although not a party to the case, President Nixon moved to
quash the subpoena under a claim of the presidential
communications privilege arguing that the privilege was absolute
in the civil context. *Id.* After taking note that President
Nixon's claim of privilege did not concern "a claim of a need to
protect national security, military or diplomatic secrets," the
Court "reject[ed] Mr. Nixon's contention that a formal claim of
privilege based on the generalized interest of presidential
confidentiality, without more, works an absolute bar to
discovery of presidential conversations in civil litigation."
*Id.* at 245-46.

Rather than employing an absolute privilege, the Court
again balanced the interests in confidentiality with that of
disclosure. *Id.* at 247-48. The Court recognized that even in
civil litigation there is "a constitutional value in the need

for disclosure in order to provide the kind of enforcement of constitutional rights that is presented by a civil action for damages, at least where . . . the action is tantamount to a charge of civil conspiracy among high officers of government to deny a class of citizens their constitutional rights." *Id.* at 247. It was of "cardinal significance" to the Court that the "claim of privilege [was] being urged solely by a former president, and there [was] no assertion of privilege by an incumbent president." *Id.* at 247 (stating the "[a]bsence of support from the incumbent [president] at least indicates that 'the risk of impairing necessary confidentiality is attenuated.'" (citation omitted)). After balancing the interests in confidentiality against the interests in disclosure, the Court found that the privilege had to yield to the plaintiffs' showing of need in the case. *Id.* at 248–49. Accordingly, the Court remanded the case for, among other things, *in camera* review of the challenged materials by the district court to determine which materials would be released. *Id.* at 251.

The D.C. Circuit's most comprehensive analysis of the presidential communications privilege was perhaps in *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997). *In re Sealed Case*, a criminal matter, concerned a grand jury subpoena for documents pertaining to White House Counsel's investigation of a former cabinet member. *Id.* at 734. After surveying the *Nixon* cases

including *Nixon*, *Dellums*, and *Sirica*, the Court observed that these cases "all employed a balancing methodology" in which the "opinions balanced the public interests served by protecting the President's confidentiality in a particular context with those furthered by requiring disclosure." 121 F.3d at 753. However, since the Court's prior precedent established that in the criminal context the privilege "can be overcome by a sufficient showing that subpoenaed evidence is needed for a criminal judicial proceeding" the Court focused on that inquiry. *Id.*

With regard to the necessity inquiry, the Court determined that the necessity standard has two components: (1) "each discrete group of the subpoenaed materials [must] likely contain[] important evidence;" and (2) "this evidence is not available with due diligence elsewhere." *Id.* at 754. The first component requires that "the evidence sought must be directly relevant to issues that are expected to be central to the trial." *Id.* The second component requires the person requesting the materials to show that "this evidence, or equivalent evidence, is not [practicably] available from another source." *Id.* at 759. Applying these standards, the Court held that the party seeking the materials made a sufficient showing of need for certain documents but not for others and remanded the case back to the district court. *Id.* at 763–64.

**III. DISCUSSION**

The foregoing cases illustrate the difficulties presented in evaluating a claim of presidential communications privilege but provide a concrete framework for a Court to do so. With these cases in mind, the Court now undertakes the "difficult business of delineating the scope and operation of the presidential communications privilege" in this case. *See In re Sealed Case*, 121 F.3d at 762. The Court first balances the public interests at stake by weighing the interest in maintaining confidentiality of the information over which Treasury claims privilege with the interest in disclosure under the particular circumstances of the allegations in this case. The Court next determines if the Respondents have shown sufficient need for the materials. For the reasons stated below, the Court holds that the interests in disclosure in this case indeed do outweigh the general interest in confidentiality asserted by Treasury; and Respondents have shown the requisite need for the majority of the documents they seek.

**A. Public interests at stake**

**1. Public interest in confidentiality**

The Court's first task is to determine the "interests served by protecting the President's confidentiality in [this case's] particular context." *In re Sealed Case*, 121 F.3d at 753. The Supreme Court has effectively recognized a continuum when

analyzing the public interest in maintaining confidentiality in presidential communications. At one end of that continuum is a claim of privilege based on a "need to protect military, diplomatic, or sensitive national security secrets." *See Nixon*, 418 U.S. at 706; *see also Sirica*, 487 F.2d at 716 (noting the items over which President Nixon asserted the privilege did not contain military or state secrets). The public interest in maintaining confidentiality of presidential communications is at its strongest when the claim of privilege rests on a need to safeguard this type of information--information which implicates international and national security interests. *See Nixon*, 418 U.S. at 706. Indeed, in such cases, it is difficult to imagine any interest in disclosure which could outweigh the interest in confidentiality. *See id.* (stating that such a claim based on national security interests may be subject to absolute privilege).

On the other end of the continuum, in which the public interest in confidentiality is much weaker, is "when the privilege depends solely on the broad, undifferentiated claim of public interest in the confidentiality of [presidential] conversations." *Id*. Although claims of the presidential communications privilege are "constitutionally based, and entitled to great weight," *Dellums*, 561 F.2d at 246, nevertheless when the privilege is based on a generalized claim

of confidentiality "a confrontation with other values arises," and a Court must weigh the competing interests of those values. *Nixon*, 418 U.S. at 706.

Like in *Dellums* and *Nixon,* the privilege asserted by Treasury "is not premised on a claim of a need to protect national security, military or diplomatic secrets." *See, e.g., Dellums*, 561 F.2d at 242. Rather, Treasury's claim of privilege is premised on the general "needs of present and future Presidents to maintain the confidentiality of communications with their advisors." *See id.* Moreover, in contrast with the highly sensitive information related to national security interests, the nature of the information Treasury seeks to withhold is purely commercial. As explained in the declaration filed by Treasury the "documents . . . as to which the presidential communications privilege is being asserted consist of [materials] that relate to the President's decisions as to how the United States should address the financial distress of several of its large automobile corporations and protect the country from the potential consequences of their bankruptcy." Decl. of Jennifer M. O'Connor, ECF No. 35-3 ¶ 7.

It is also significant that in this case the President has not personally asserted the privilege. *See Dellums*, 561 F.2d at 247. Several D.C. Circuit cases have considered not only the nature of the materials claimed under the privilege but also *who*

asserts the privilege. In *Dellums*, for example, the Court found that it was "of cardinal significance . . . [that] there has been no assertion of privilege by an incumbent president." *Id.* As the D.C. Circuit has explained, "[a]bsence of support from the incumbent at least indicates that the risk of impairing necessary confidentiality is attenuated." *Id.* (citations and internal quotation marks omitted).

In this case, no President--past or present--has invoked the privilege for these documents, and the incumbent has not indicated support for this claim of privilege.[3] Rather the former Deputy Counsel to President Obama invoked the privilege on "behalf of the Office of the President." Decl. of Jennifer M. O'Connor, ECF No. 35-3 ¶ 4. This invocation stands on different ground than the invocations made in other presidential communications privileges cases which were expressly made either by a President, past or current, or made on behalf of the President, rather than one made on behalf of the Office of the President generally. *See, e.g.*, *In re Sealed Case*, 121 F.3d at

---

[3] Whether a sitting President "must personally invoke the privilege" and whether a former President can invoke the privilege at all remain open questions. *See Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (recognizing whether the president must personally invoke the privilege is an open question); *Dellums*, 561 F.2d at 245 (assuming without deciding a former president could invoke the privilege but stating that such an invocation would be entitled to less weight).

744-46 n.16 (noting former White House Counsel's affidavit stated he was specifically directed by the President to invoke the privilege). If a former President's invocation is entitled to less weight than an incumbent, *Dellums*, 561 F.2d at 245, it follows that an invocation by the government on behalf of the Office of the President of a former administration, is similarly entitled to less weight.

The Court also finds substantial the considerable amount of time that has passed since these documents were created and the public nature of these documents. The documents in this case are intertwined with decisions made regarding the government's auto bailout--nearly 10 years ago. As the Supreme Court has explained, "the expectation of the confidentiality of executive communications . . . has always been limited and subject to erosion over time after an administration leaves office*." Nixon v. Adm'r Of Gen. Servs.*, 433 U.S. 425, 451 (1977).

Furthermore, the public interest in maintaining confidentiality is also diminished by the undisputed fact that there have been public disclosures already made on the subject of the requested documents. The interest in maintaining the confidentiality of conversations related to a subject, "substantially diminishes" when there is public testimony on that subject. *Sirica*, 487 F.2d at 715 (stating public testimony given related to Watergate substantially diminished the

President's interest in maintaining confidentiality of the conversations related to the subject); *cf. Comm. on Oversight & Gov't Reform, U.S. House of Rep. v. Lynch*, 156 F. Supp. 3d 101, 111-12 (D.D.C. 2016) (holding plaintiff's need for withheld documents under the deliberative process privilege outweighed the need for confidentiality in part because the substance of the documents had already been made public). In this case, there has been considerable public testimony about Treasury's decision-making process for the termination of the pension plan including testimony before Congress, *see, e.g.*, Testimony, Oral and Written Statement of Matthew Feldman, Oversight of the SIGTARP Report Treasury's Role in the Delphi Pension Bailout: Hearing Before the H. Subcommittee on Government Operations of the Committee on Oversight and Government Reform, ECF No. 30-6, and at least one book written by a former member of Treasury on the subject.[4]

Faced with these facts, Treasury repeatedly argues that the presidential communications privilege still applies. *See, e.g.*, Treas. Opp'n, ECF No. 74 at 11. For example, Treasury argues that despite the fact that the vast majority of the documents were not viewed by the President, the privilege "applies fully . . . to all 61 of the documents." *Id.* Treasury's response to the

---

[4] *See* Steven Rattner, Overhaul: An Insider's Account of the Obama Administration's Emergency Rescue of the Auto Industry (2010).

fact that none of the documents implicate national security concerns is that "the privilege applies . . . to any conversation that takes place in the President's performance of his official duties." *Id.* (citation and alterations omitted).

Treasury's arguments miss the point. Respondents have no quarrel with the Court's holding that the 61 documents Respondents seek are covered by the presidential communications privilege. *See* Mem. Op., ECF No. 45. The issue is the scope of that privilege under the particular circumstances of this case. *See Black*, 2017 WL 6553628 at \*2. The Court finds that although the President at all times maintains a strong interest in the confidentiality of his or her communications, under these circumstances--when a broad and undifferentiated claim of confidentiality is invoked by the government on behalf of the Office of the President to protect information of a commercial nature--the strength of the public interest in maintaining the confidentiality of these documents is not particularly strong.

## 2. Public interest in disclosure

The Court next must determine the public interest "furthered by requiring disclosure" under the circumstances of this case. *In re Sealed Case*, 121 F.3d at 753. The Supreme Court has made clear that the interests in disclosure in a civil case are not on equal footing as the interests in a criminal case. *See Cheney v. United States Dist. Ct.*, 542 U.S. 367, 384 (2004).

"The need for information in the criminal context is much weightier because our historical commitment to the rule of law . . . is nowhere more profoundly manifest than in [the Court's] view that the twofold aim of criminal justice is that guilt shall not escape or innocence suffer." *Id.* (citations and internal quotation marks omitted). Therefore the "right to production of relevant evidence in civil proceedings does not have the same constitutional dimensions" as in a criminal case. *Id.* (citation and internal quotation marks omitted). Nevertheless, the D.C. Circuit has recognized that, although not as weighty, "there is also a strong constitutional value in the need for disclosure in order to provide the kind of enforcement of constitutional rights that is presented by a civil action for damages" when "the action is tantamount to a charge of civil conspiracy . . . to deny a class of citizens their constitutional rights. *Dellums*, 561 F.2d at 242; *see also Cheney*, 542 U.S. at 385 (recognizing the need for information in civil cases is "far from negligible").

Treasury does not address the strength of the public interest in disclosure under the circumstances of this case but notes that "[h]ere, the underlying action is a civil case, not a criminal proceeding." Treas. Opp'n, ECF No. 74 at 10. It is true that the Plaintiffs have brought a civil action, but the nature of the case (i.e., civil or criminal), by itself, does not end a

court's inquiry on the issue. *Dellums*, 561 F.2d at 245–46 (rejecting the argument that the presidential communications privilege is absolute in civil litigation).

In *Dellums,* plaintiffs brought a civil action for damages alleging that "a policy or plan was devised by the defendants . . . which led to and instigated the allegedly unlawful arrest and detention of plaintiffs" during a protest against American military involvement in Southeast Asia. *Id.* at 248. In support of their claim for unconstitutional detention, Plaintiffs sought information related to the Nixon administration's conversations in which the demonstrations were discussed. *Id.* The defendants in *Dellums* argued that, regardless of the necessity or relevance of the information sought, a claim of the presidential communications privilege was an absolute bar to discovery in a civil case. *Id.* at 246. The D.C. Circuit rejected such a sweeping interpretation of the privilege and made it clear that in civil actions in which a plaintiff alleges actions "tantamount to a charge of civil conspiracy among high officers of government to deny a class of citizens their constitutional rights" a government's claim of privilege could yield to a sufficient showing of need. 561 F.2d at 245–47.

Plaintiffs in this case have alleged in their civil action in Michigan that their pension plans were terminated in violation of ERISA and the United States Constitution because of

undue pressure exerted by Treasury to bail out the auto industry. Renewed Mot. Compel, ECF No. 70 at 26. They have alleged that Treasury pressured the PBGC to abandon its statutory duty, and to terminate the pensions so that GM could receive monetary relief in violation of the Due Process Clause of the Constitution. *Id.* at 21. In other words, they allege that a class of over 20,000 was sold out by the government simply to bail out the corporate interests of the auto industry.

As the D.C. Circuit has explained "Congress designed ERISA to safeguard employees against the loss of anticipated retirement benefits, following decades of service." *Page v. PBGC*, 968 F.2d 1310, 1311 (D.C. Cir. 1992). The PBGC's role is "key to the congressional plan" and its function is to "meet the problem of plans terminated without assets sufficient to cover vested benefits" and to "provide for the timely and uninterrupted payment of pension benefits [within specified dollar limitations] to participants and beneficiaries under plans [covered by Title IV]." *Id.* (citing 29 U.S.C. § 1302(a)).

Under these circumstances the Court concludes that the public interest in disclosure is just as strong as in *Dellums*. Like the plaintiffs in *Dellums*, Respondents in their civil action have alleged a "civil conspiracy among high officers of government to deny a class of citizens their constitutional rights." *See Dellums*, 561 F.2d at 247. As stated above, the PBGC

sits as a fiduciary of pension plans and is tasked to ensure that the personal tragedy of pension termination is not considered lightly. Respondents have alleged an abdication of that duty for improper reasons, and a conspiracy to cover up these improper actions at all costs. Balanced against Treasury's "broad, undifferentiated claim of public interest" in confidentiality, *see Nixon*, 418 U.S. at 707, the Court concludes that the interest in disclosure in this particular case sufficiently outweighs the interest in confidentiality.

This conclusion does not mean, of course, that the privilege must yield to any request for public disclosure irrespective of the need. The Court only holds that in these circumstances the proponent of a subpoena may defeat such a broad claim of privilege with a sufficient showing of need in the litigation. *See Dellums*, 561 F.2d at 248 (stating that a balance in favor of disclosure does not open the door to production, but "only to consideration whether the claim is overcome by a showing of other need, here litigat[ion] need."). The Court therefore next turns to the issue of necessity.

**B. Showing of need**

As the D.C. Circuit has instructed, a showing of need in this case entails two components: (1) Respondents "bear the burden to demonstrate with 'specificity' 'that each discrete group of the subpoenaed materials likely contains important

evidence'" and (2) "bear the further burden of demonstrating
that the subpoenaed 'evidence is not available with due
diligence elsewhere.'" *Black*, 2017 WL 6553628 at \*2 (quoting *In
re Sealed Case*, 121 F.3d 754–55, 756.)[5] The Court addresses each
issue in turn.

### 1. Importance of the evidence sought

Under the first component of the need inquiry, "[a] party
seeking to overcome a claim of presidential privilege must
demonstrate . . . that each discrete group of the subpoenaed
materials likely contains important evidence." *In re Sealed
Case*, 121 F.3d at 754. This component means "that the evidence
sought must be directly relevant to issues that are expected to
be central to the trial." *Id.* Requests for documents that are
"tangentially relevant or would relate to side issues" would not
satisfy this component of the need inquiry; the same holds true
when a "claim that subpoenaed materials will contain such
evidence represents mere speculation." *Id.* (citations omitted).

Discovery in this case is limited to Count Four of
Respondents' complaint; and was defined by the Michigan Court as
follows:

> In terms of addressing the scope of discovery for
> purposes of entering a scheduling order – [t]he Court's

---

[5] The parties agree that the standard of need as identified in
*Dellums* and rearticulated in *Black* should govern the showing of
need in this case. *See* Renewed Mot. ECF No. 70 at 23; Treas.
Opp'n, ECF No. 74 at 9–10.

> initial focus, keeping the above case law in mind, is on
> Count 4 and whether termination of the Salaried Plan
> would have been appropriate in July 2009 if, as
> Plaintiffs contend, Defendants were required under 29
> U.S.C. § 1342(c) to file before this court "for a decree
> adjudicating that the plan must be terminated in order
> to protect the interests of the participants or to avoid
> any unreasonable deterioration of the financial
> condition of the plan or any unreasonable increase in
> the liability of the fund."

*Black v. PBGC*, No. 09-cv-13616 (E.D. Mich. Sept. 1, 2011), ECF No. 193 at 3-4. To that end, the Court allowed the parties to engage in discovery related to the substantive component of Count Four--whether the PBGC had met the statutory requirements for termination under Section 1342(a). Accordingly, discovery is limited to whether the PBGC terminated the plan because it had "not met the minimum funding standard," was "unable to pay benefits when due," or "the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated." 29 U.S.C § 1342(a)(1)-(4).

As stated above, Respondents' theory of the case is that the termination of the pension plan "occurred as the result of politics, with Treasury having impermissibly pressured the PBGC to acquiesce in the Plan's termination as part of Treasury's political goals in restructuring the auto industry in general, and GM in particular." Renewed Mot. Compel, ECF No. 70 at 10. Therefore, the issues the Respondents expect to be central at

trial include whether GM could have reassumed the Salaried Plan thereby continuing the pension plan and avoiding termination, and whether Treasury influenced the PBGC to terminate the plan despite its viability through GM. *See id.* at 27–28.

Respondents' discovery request can be grouped into three categories: (1) Draft memoranda from staffers to Dr. Lawrence Summers, the Director of the National Economic Council, Assistant to the President for Economic Policy, and co-chair of the Auto Task Force; (2) electronic mail conversations among Auto Team members concerning advice provided to President Obama; and (3) personal requests for information by President Obama along with Treasury emails and a memorandum in response.

The first group of documents, "[d]raft memoranda from staffers to Dr. Lawrence Summers" providing updates regarding GM and Delphi, comprise the majority (53 of 61) of the withheld documents.[6] These documents are iterations of 13 memoranda from Autoteam staffers to Dr. Summers written between the months of February and August 2009. The memos in this group relate to Treasury's impressions on GM and Chrysler restructuring plans, Treas. Original Priv. Log, ECF No. 35-5 at 140; Delphi's

---

[6] *See* Treas. Revised Privilege Log, ECF No. 51-2 Nos. 67, 72, 84, 94, 275, 560, 593, 596, 599, 601, 603, 605, 611, 623, 627, 629, 631, 633, 638, 668, 670, 672, 674, 676, 692, 758, 759, 760, 761, 762, 766, 770, 777, 849, 856, 859, 860, 863, 944, 948, 950, 956, 1006, 1089, 1091, 1094, 1152, 1166, 1168, 1217, 1219, 1221, and 1223.

liquidity issues and possible ramifications of Delphi's
shutdown, *id.* at 152-54; and plans for GM's reorganization and
updates on GM negotiations, *id.* at 178.

The Court finds that Respondents have shown that the
documents requested in this first group likely contain important
evidence. These memoranda cover Treasury's views on several
topics that are relevant to Respondents' theory of the case.
Furthermore, Respondents' discovery efforts have revealed that
at the time the salary plan was terminated it was a "relatively
well-funded plan." Renewed Mot., ECF No. 70 at 25 (citing Watson
Wyatt Actuarial Certification, ECF No. 19-5 at 2). Respondents
have also discovered the fact that, prior to Treasury's
proactive involvement, the PBGC was advocating for a
circumstance under which the pension plan remained in effect.
*See, e.g.*, D. Cann. Dep. Tr., ECF No. 11-6, 67:6-14 (stating
PBGC was "cheerleading" for the transfer of the plan). A
critical issue in the Michigan action will be the reason for the
sudden change in strategy. The documents in the first group
which relate to Treasury's interactions with the PBGC and its
impressions about "Delphi and its pensions liabilities" as well
as Treasury's "impressions . . . on GM and Chrysler
restructuring plans," ECF No. 70 at 29, are documents that go to

the heart of that issue and are clearly relevant to Respondents' claim of undue influence by Treasury.[7]

The second group consists of four documents which are a series of email chains from March 28, 2009 to May 28, 2009.[8] The emails relate to discussions between the Auto Team and Dr. Summers about GM and Delphi (No. 621); a presidential announcement regarding GM's restructuring (Nos. 610 and 776); and emails relating to the disparity between GM and Toyota's labor rates (No. 358). The Court holds that document numbers 610, 621 and 776 in this group likely contain important evidence. Although not dispositive, the timing of the documents is important: They were created at a time during which there was a mediation with important parties including the PBGC, Delphi, and GM relating to the bankruptcy proceedings. *See* House Dep. Tr., ECF No. 11-8, at 143:9–22. Critically, these documents relate to GM's restructuring and there is no question that the resolution of the pension fund was a significant issue related to GM's restructuring through the bankruptcy.

---

[7] The Court notes that this conclusion is further supported by Plaintiff's *ex parte* submission. Without discussing the contents of the submission, it suffices to say that discovery has revealed that this category of information is relevant to Respondents' claims.

[8] *See* Treas. Revised Privilege Log, ECF No. 51-2 Nos. 358, 610, 621, and 776.

Document number 358, however, relates to "the cost gap between GM and Toyota labor rates;" and there is no indication, other than the timing of these emails, that the evidence is related to a central issue at trial. Respondents argue that the timing of these emails, May 26 through 28, is sufficient. Under that logic, however, Respondents would be entitled to any email written by the Auto Team or Treasury around that time period regardless of the email's relevance to the issues in this case. The issues regarding "the cost gap between GM and Toyota labor rates" without some connection to GM's restructuring or the pension fund, is the sort of "tangentially relevant" request for documents that the D.C. Circuit has instructed will not meet the important evidence prong of the needs test.[9] *See In re Sealed Case*, 121 F.3d at 754 (stating "tangentially relevant" documents or evidence that "would relate to side issues" would not satisfy the need requirement). Accordingly, the Court finds that only document numbers 610, 621 and 776 in this group are likely to contain important evidence.

---

[9] Respondents' *ex parte* submission related to this request does not change the Court's conclusion. As it pertains to No. 358, the submission merely repeats the fact that the timing of the emails coincided with the mediation suggest the emails likely contain important evidence. The Court disagrees, timing alone cannot transform documents about "labor rates" to evidence about the issues central to Respondents' civil action.

The third group consists of five documents that are related to a draft letter from President Obama containing a request to Dr. Summers regarding the Delphi Salaried plan.[10] The documents at issue in this group likely relate to a "Draft memorandum regarding [the PBGC's] decision to take over the salaried and hourly pension plans of Delphi." Treas. Original Privilege Log, ECF No. 35-5 at 140. These documents relate to the decisions about the salaried pension fund that are significant to the claims in the civil action. The Court finds that all the documents in this category meet the important evidence component.

In short, with the exception of document number 358, the email string relating to automotive labor rates, the Court finds the evidence sought in the three categories are "directly relevant to issues that are expected to be central to the trial." *In re Sealed Case*, 121 F.3d at 754. And therefore, those documents meet the first component of the need inquiry.

## 2. Availability of the evidence elsewhere

Under the second component of the need inquiry a party challenging the claim of privilege must demonstrate "that [the] evidence is not available with due diligence elsewhere." *In re Sealed Case*, 121 F.3d at 754. This component "reflects [Supreme

---

[10] *See* Treas. Revised Privilege Log, ECF No. 51-2 Nos. 763, 764, 765, 766, and 767.

Court precedent] that privileged presidential communications should not be treated as just another source of information." *Id.* at 755. To meet this standard, "[e]fforts should first be made to determine whether sufficient evidence can be obtained elsewhere, and the subpoena's proponent should be prepared to detail these efforts and explain why evidence covered by the presidential privilege is still needed." *Id.*

Respondents argue that these documents are not "just another source of information" but rather the *only* source of information outlined above. Renewed Mot., ECF No. 70 at 39–42. Respondents point out the fact that they have conducted discovery from all other key parties in this case and have not received information that speaks to the issues related to the subjects in their discovery request. *Id.* at 39. Respondents also note that the PBGC interacted with Treasury almost exclusively through Joe House, the Director of the Department of Insurance Supervision and Compliance at the PBGC, and Matthew Feldman, a member of the Auto Team at Treasury. And that Mr. House failed to recall anything of significance related to Treasury's involvement with the PBGC during his deposition in the civil action. Renewed Mot., ECF No. 70, at 39–40 (citing ECF No. 11 at 19-20 and n.10 (noting approximately 60 instances in Mr. House's deposition transcript where he states his inability to recall events related to Delphi's plans)). Last, Respondents argue that

information related to Treasury's Auto Team's determination that GM could not reassume the pension plans, an issue of critical importance to its claims, is uniquely in the possession of Treasury. Renewed Mot., ECF No. 70 at 41–42.

Treasury's lone response is that Respondents have scheduled a deposition of Mr. Feldman, a member of the Auto Team, and can question him about Treasury's influence into PBGC's pension negotiations. Treas. Opp'n, ECF No. 74 at 8–9. Therefore, Treasury argues, the information is available from another source. But, as Respondents point out, a deposition almost a decade after the events that give rise to the claims in this case is not equivalent to documentary evidence prepared at the time of the controversy. *See Dellums*, 561 F.2d at 248. (affirming district court ruling which noted that a deposition is "far more inferior to the actual contemporaneous" documentary evidence related to the allegations).

The Court concludes that Respondents have met their burden in showing that the evidence they seek is "not available with due diligence elsewhere." *See In re Sealed Case*, 121 F.3d at 755. Respondents have had considerable difficulties obtaining information related to Treasury's interactions with the PBGC vis-à-vis the termination decision. Deposition attempts have failed to uncover this sort of evidence because the person who would have this information, Mr. House, simply cannot remember.

Respondents have run into similar roadblocks in their attempts to obtain this sort of information from the other key players in this case because these parties do not have the information Respondents seek.

Respondents have made a showing of substantial need for overcoming the general claim of privilege asserted by Treasury. The D.C. Circuit has explained that upon a sufficient showing of need the Court is to review *in camera* the subpoenaed documents to "identify and release specific items of evidence that might reasonably be relevant to" the claims at issue in the case. *In re Sealed Case*, 121 F.3d at 762. Therefore, this Court will order the following documents to be filed for in camera review: 67, 72, 84, 94, 275, 560, 593, 596, 599, 601, 603, 605, 610, 611, 621, 623, 627, 629, 631, 633, 638, 668, 670, 672, 674, 676, 692, 758, 759, 760,761, 762, 763, 764, 765, 766, 767, 770, 776, 777, 849, 856, 859, 860, 863, 944, 948, 950, 956, 1006, 1089, 1091, 1094, 1152, 1166, 1168, 1217, 1219, 1221, and 1223. Treasury should provide a justification sheet for each document explaining why the document does not contain evidence that may be reasonably relevant to the claims in this case.

## IV. CONCLUSION

This case calls upon the Court to "strike a balance between the twin values of transparency and accountability of the executive branch on the one hand, and on the other

hand, protection of . . . the President's ability to obtain candid, informed advice." *See Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1112. The allegations in the civil action in this case are grave, and the necessity for the subpoenaed materials dire. Under these circumstances, Treasury's broad, undifferentiated claim of privilege must yield to the Respondents' showing of need for the majority of documents Respondents seek. Accordingly, Respondents' renewed motion to compel is **GRANTED in PART and DENIED in PART.** An appropriate Order accompanies this Memorandum Opinion.

     **SO ORDERED.**

**Signed:**    **Emmet G. Sullivan**
           **United States District**
           **October 15, 2018**